IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 19-00145-05-CR-W-DGK |
| ) | |
| BRAN RODRIGUEZ, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION TO SUPPRESS

Before the court is Defendant's Motion to Suppress Fruits of Unlawful Search. (Doc. #135) Defendant moves the Court to suppress the firearms recovered from his home on April 8, 2019. For the following reasons, Defendant's motion should be denied.

### I. INTRODUCTION

A Superseding Indictment was returned on June 4, 2019, charging Defendant and fifteen co-defendants with one count of conspiracy to distribute methamphetamine and heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846, and one count of conspiracy to commit money laundering, in violation 18 U.S.C. §§ 1956(a)(1)(A)(i), (B)(i), (ii) and (h). Additionally, Defendant and six co-defendants are charged with one count of possession of firearms in connection with a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). The Superseding Indictment also contains a criminal forfeiture allegation.

On September 20, 2019, Defendant filed a motion to suppress. (Doc. #135) The government responded on October 17, 2019, (Doc. #144), and Defendant replied on October 24, 2019 (Doc. #146). An evidentiary hearing was then held. The Government appeared by

1

Assistant United States Attorney Bruce Rhoades. Defendant was present, represented by appointed counsel Fred Duchardt. The Government called FBI Special Michael Mrachek, Kansas City, Missouri Police Department Detective and FBI Task Force Officer Edward Caballero, Kansas City, Missouri Police Department Detective Shane Gaddis and FBI Special Agent Daniel Hajek to testify. The following exhibits were admitted into evidence:

| | |
|---|---|
| Defendant's Exhibit 1001: | Photograph – 806 Bales Court showing exterior front; |
| Defendant's Exhibit 1002: | Photograph – 806 Bales Court exterior front showing south side; |
| Defendant's Exhibit 1003: | Photograph – 806 Bales Court exterior front showing south side; |
| Defendant's Exhibit 1004: | Photograph – Alleyway west of 800 block of Bales Court; |
| Defendant's Exhibit 1005: | Photograph – #2 Alleyway west of 800 block of Bales Court; |
| Defendant's Exhibit 1006: | Photograph – 806 Bales Court exterior rear showing north side; |
| Defendant's Exhibit 1007: | Photograph – 806 Bales Court showing exterior rear; |
| Defendant's Exhibit 1008: | Photograph – Intersection of 8th Street and Bales Court; |
| Defendant's Exhibit 1009: | Photograph – 806 Bales Court looking into front window; |
| Defendant's Exhibit 1010: | Photograph – 806 Bales Court looking east into living room from dining room; |
| Defendant's Exhibit 1011: | Photograph – 806 Bales Court looking east from kitchen through dining room into living room; |
| Defendant's Exhibit 1012: | Photograph – 806 Bales Court in dining room looking west into hallway to bedrooms; |
| Defendant's Exhibit 1013: | Photograph – 806 Bales Court in dining room looking west into hallway, and into northwest bedroom; |
| Defendant's Exhibit 1014: | Photograph – 806 Bales Court in hallway looking into northwest bedroom; |
| Defendant's Exhibit 1015: | Photograph – 806 Bales Court showing northwest bedroom; |
| Defendant's Exhibit 1016: | Photograph – 806 Bales Court showing bathroom; and |
| Defendant's Exhibit 1017: | Photograph – 806 Bales Court showing northeast bedroom. |

Following the hearing, both parties submitted supplemental briefing. (Doc. ##198, 200, 205)

## II. FINDINGS OF FACT

On the basis of the evidence presented at the suppression hearing, the undersigned submits the following proposed findings of fact:

2

1. In April of 2019, Special Agent Michael Mrachek was the FBI's Fugitive Task Force Coordinator. He had been with the FBI for approximately 23 years and had been the head of the Fugitive Task Force for four years. (Tr. at 16-17) In this position, Special Agent Mrachek focused on executing outstanding state and federal arrest warrants in conjunction and in cooperation with local task force officers. (Tr. at 6-7) He had conducted between 100-200 arrests in residences during his four-year period as head of the Fugitive Task Force. (Tr. at 16) Prior to leading the Fugitive Task Force, Special Agent Mrachek was assigned to the SWAT team where he also conducted felony arrests and executed search warrants. (Tr. at 17)
2. Special Agent Mrachek had been an entry team member his entire career. (Tr. at 17) At the beginning of his career, he trained two days a month. (Tr. at 18) Near the end of his 17 years with the SWAT team, he trained four days a month. (Tr. at 18) These trainings focused on tactics, officer safety and a conscious effort to use cover and tactics that were safe for law enforcement and the individuals they were encountering. (Tr. at 17)
3. Special Agent Mrachek and his team were responsible for executing an arrest warrant for Defendant at Defendant's home. (Tr. at 7) On April 5, 2019, three days preceding execution of the warrant, Special Agent Mrachek and his team attended a briefing about the case with FBI Special Agent Daniel Hajek. (Tr. at 8) They learned that the case involved a heroin and methamphetamine conspiracy, that Defendant should be considered armed and dangerous because of the group's known possession of weapons,[1] and that co-defendants Paz and Gonzales could possibly be encountered at Defendant's residence since they had been seen there between eight and twelve times before. (Tr. at 21, 22, 37, 52, 73, 81, 93, 98) They also learned that drugs had been picked up from Defendant's residence. (Tr. at 38) The team was advised to expect Defendant, a middle-aged female and Defendant's sister to be inside the home. (Tr. at 38, 73)
4. Kansas City, Missouri Police Department Officer and FBI Task Force Officer Edward Caballero has been in law enforcement for 14 years. (Tr. at 47) He spent five years in the Kansas City, Missouri Police Department's Gang Unit, four years in the Drug Enforcement Unit and the last six years as a Task Force Officer with the FBI. (Tr. at 48) Task Force Officer Caballero's first language is Spanish and he uses this dual language capability in his job. (Tr. at 49)
5. Task Force Officer Caballero had been involved in the investigation of this case and was aware of a narcotics transaction that had taken place with Defendant and involved co-defendants Paz and Gonzalez. (Tr. at 51) He had also observed co-defendants Paz and Gonzales at Defendant's home during the day. (Tr. at 70, 73)
6. Prior to going to Defendant's residence to serve the warrant on April 8, 2019, Special Agent Mrachek's team met with Task Force Officer Caballero. (Tr. at 10) In addition to Defendant's two family members living there, the team was told again that co-defendants Paz and Gonzalez might be present at the residence. (Tr.

---

[1] Defendant had not been observed to personally be in possession of a firearm. (Tr. at 102)

at 54, 77-78)
7. Other teams were tasked with coordinated arrests of co-defendants on the same day at different addresses. (Tr. at 8-9, 68)
8. The arrest warrant for Defendant was executed at approximately 6:30 a.m. (Tr. at 9, 12)  The weather was cool/cold and dreary.[2]  (Tr. at 12, 20, 55-56, 79)
9. Officers knocked on the door; Defendant answered after numerous knocks wearing only boxer shorts.  (Tr. at 15, 55, 56, 79)  Defendant was immediately placed under arrest, handcuffed, and sat on the front porch.  (Tr. at 16, 20, 56, 79)
10. Defendant asked officers to get him clothing and stated it was in his bedroom.  (Tr. at 72, 80)  Officers ultimately entered the house to do so.  (Tr. at 80)
11. Special Agent Mrachek turned his attention to the residence due to the open front door and Defendant's grandmother emerging.  (Tr. at 20-21, 25, 27)  His training had taught him to avoid open doors so that he was not susceptible to being seen and/or addressed by someone wishing to do him harm.  (Tr. at 19)
12. Special Agent Mrachek could not communicate with Defendant's grandmother due to a language barrier, so Task Force Officer Caballero began speaking with her in Spanish.  (Tr. at 23)
13. Task Force Officer Caballero and Defendant's grandmother began speaking on the front porch then moved inside to the living room.  (Tr. at 57)  Officers stood watch to make ensure no one else was there who could come out and hurt them. (Tr. at 26, 59)
14. Defendant's grandmother was agitated and angry about Defendant being arrested. (Tr. at 58)  Task Force Officer Caballero explained why Defendant had been arrested and sought consent to search the house. (Tr. at 58)  Consent was not given.  (Tr. at 60)  This conversation lasted a couple of minutes.  (Tr. at 58)
15. Defendant's grandmother did, however, insist that he be given clothes.  (Tr. at 71, 72)
16. Special Agent Mrachek testified he would not allow a team member to enter the bedroom to obtain clothing before the room had been cleared.  (Tr. at 43)
17. The officers, accordingly, had to make sure the house was safe.  (Tr. at 59, 80-81)  A protective sweep was conducted because Defendant's sister, who was expected to be there, was unaccounted for and because officers were not aware whether other individuals involved in the conspiracy, namely Paz and Gonzales, had been arrested yet.  (Tr. at 39, 42, 44-45, 59-60)
18. Officers had not heard any sounds to suggest anyone else was in the home. (Tr. at 42)  Officers asked Defendant and his grandmother if anyone else was in the home they were told "no."  (Tr. at 42)  When officers called out to see if anyone was present they did not get a response.  (Tr. at 41-42)  However, Special Agent Mrachek testified he had experienced situations where he called out and did not receive an answer, but later found people.  (Tr. at 44-45)

---

[2]Special Agent Mrachek believed he was wearing pants and "some sort of long sleeves."  (Tr. at 20)  Task Force Officer Caballero testified he was wearing a sweatshirt with a vest on top of it.  (Tr. at 56)  Detective Gaddis testified he was wearing pants and long sleeves.  (Tr. at 79)

4

19. When conducting the protective sweep, officers looked in places where a person could reasonably hide. (Tr. at 81) Special Agent Mrachek testified it is standard procedure to always look underneath beds, no matter the height, due to his experience of finding individuals under beds. (Tr. at 44, 46)
20. The bed in Defendant's room was a pallet-style bed where the mattress sits on top of a wooden frame that extends completely to the floor (Tr. at 82, 85; Def. Exh. 1014). This style of bed prevented officers from lying on the floor and looking under the mattress. (Tr. at 82, 85; Def. Exh. 1014) Accordingly, officers lifted the mattress and then the slats from the floor to look in the open space underneath the slatted area where someone could hide. (Tr. at 82) Firearms were seen in this open space and recovered. (Tr. at 27, 29, 43, 60, 81-82)
21. The protective sweep lasted "[s]everal minutes[;] [t]wo to three, four minutes." (Tr. at 41)

## III. DISCUSSION

Defendant Rodriguez challenges the April 8, 2019, search of his residence. He argues that the protective sweep was not justified and, additionally, that the clothing exception should not apply in this case.

The Fourth Amendment prohibits unreasonable searches and seizures. "Ordinarily, the arrest of a person outside of a residence does not justify a warrantless search of the residence itself." United States v. DeBuse, 289 F.3d 1072, 1074 (8th Cir. 2002). An exception to this rule, however, allows law enforcement to enter the residence to retrieve clothing for an arrestee. Id. (citing United States v. Gwinn, 219 F.3d 326, 333 (4th Cir. 2000)). Courts that have applied the "clothing exception" have done so using the exigent circumstances exception to the warrant requirement. See, e.g., United States v. Reid, 769 F.3d 990, 992-93 (8th Cir. 2014); DeBuse, 289 F.3d at 1074; United States v. Wilson, 306 F.3d 231, 241 (5th Cir. 2002) (overruled on other grounds) (recognizing a duty to obtain clothing when the defendant was arrested wearing only boxer shorts); Gwinn, 219 F.3d at 333 (holding "an officer is authorized to take reasonable steps to address the safety of the arrestee and that the arrestee's partially clothed status may constitute

5

an exigency justifying the officer's temporary reentry into the arrestee's home to retrieve clothes reasonably calculated to lessen the risk of injury to the defendant"); United States v. Butler, 980 F.2d 619, 621 (10th Cir. 1992); United States v. DiStefano, 555 F.2d 1094, 1101 (2d Cir. 1977) ("The officers had a duty to find clothing for [the defendant] to wear or to permit her to do so."); United States v. James, No. 1:07CR00057 ERW (FRB), 2007 WL 2908886 at *4 (E.D. Mo. Oct. 4, 2007) ("The Court agrees with the majority of the Circuit Courts, that an officer may enter an arrestee's residence, or a specific room of that residence, in order to locate clothing for an arrestee, where such clothing is required for the defendant's health or safety.").

The instant case is distinguishable from United States v. McMullin, 576 F.3d 810, 817 (8th Cir. 2009), a case in which the Eighth Circuit declined to apply the clothing exception. In McMullin, the defendant was arrested wearing "shorts and sandals, missing only a shirt." Id. Law enforcement did not enter the residence for purposes of obtaining a shirt but, rather, to talk with the defendant in furtherance of the investigation. Id. at 813, 817. By contrast, officers here entered Defendant's bedroom upon requests from both Defendant and Defendant's grandmother. (Fact Nos. 10, 15) The weather that morning was cold and dreary; officers were dressed in long sleeves and pants. (Fact No. 8). Defendant had answered the door wearing only boxer shorts. (Fact. No. 9) Defendant, therefore, asked officers to get him clothing and told them it was in his bedroom. (Fact. No. 10) Defendant's grandmother also "insisted" that Defendant be given clothing. (Fact No. 15)

Special Agent Mrachek, who was head of the Fugitive Task Force and an experienced entry team member, testified that he would not allow a team member to enter Defendant's bedroom until the room had been cleared and they knew it was safe. (Fact Nos. 1, 2, 16) A lawful protective

6

sweep "is a quick and limited search of premises incident to an arrest and conducted to protect the safety of police officers or others." Maryland v. Buie, 494 U.S. 325, 327 (1990). A protective sweep must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Id. See also United States v. Rudaj, et al., 390 F. Supp. 2d 395, 405 (S.D. N.Y. 2005).

When officers entered Defendant's bedroom, only Defendant and his grandmother were accounted for. (Fact Nos. 9, 13) The execution team had been told both on April 5, 2019, and the morning of Defendant's arrest that Defendant's sister was also expected to be inside the house. (Fact Nos. 3, 6) Additionally, the team was told that members of the drug conspiracy should be considered armed and dangerous, that co-defendants Paz and Gonzalez may be encountered there since they had been observed at Defendant's residence on eight to twelve previous occasions, and that drugs had been picked up from Defendant's residence. (Fact Nos. 3, 5, 6) Officers were not aware if co-defendants Paz and Gonzalez had been arrested at the time they entered Defendant's bedroom. (Fact No. 17) Even though officers did not get an answer when they called out to inquire if anyone else was present, Special Agent Mrachek testified his experience taught him this did not necessarily mean no one was there. (Fact No. 18)

Special Agent Mrachek further testified it was standard procedure to look underneath beds during a protective sweep, no matter the bed's height, due to his training and experience in finding individuals hiding underneath beds. (Fact No. 19) Here, despite Defendant's argument that officers "disassembled" the bed, the evidence of record demonstrates officers merely lifted the mattress and slats to look in the open space underneath the slatted area where someone could hide. (Fact No. 20) There, they observed firearms in plain view. (Fact No. 20) The sweep was brief

7

in duration, lasting no longer than four minutes. (Fact. No. 21) Seizure of the firearms was thus constitutionally permissible and suppression is not warranted on this basis. See DeBuse, 289 F.3d at 1074.

## IV. CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and the applicable law, enter an order denying Defendant's motion to suppress.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has fourteen days from the date of this Report and Recommendation to file and serve specific objections to the same, unless an extension of time for good cause is obtained. Failure to file and serve timely specific objections may result in waiver of the right to appeal factual findings made in the report and recommendation which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

      */s/ Sarah W. Hays*
      UNITED STATES MAGISTRATE JUDGE